UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL MARCAVAGE and
MICHAEL STOCKWELL,

                              Plaintiffs,

        -against-                                        9:12-CV-00761 (LEK/DEP)

CITY OF SYRACUSE, *et al.*,

                              Defendants.
_____

## DECISION and ORDER

## I.      INTRODUCTION

        Presently before the Court is Plaintiffs' Motion for a temporary restraining order.  Dkt.

No. 4 ("Motion").  Plaintiffs seek an order enjoining Defendants from enforcing various

ordinances to the extent that such enforcement would restrict Plaintiffs' First Amendment

rights.  For the reasons that follow, Plaintiffs' Motion is granted, consistent with this Decision

and Order.

## II.     BACKGROUND

        On April 9, 2012, Plaintiff Michael Stockwell ("Stockwell") attempted to engage in

religious preaching near the Centro bus hub in downtown Syracuse, which is located in a busy

commercial zone.  Dkt. No. 1 ("Complaint") ¶ 23.  Stockwell used a portable amplification

device in order "to be heard effectively in the noisy downtown environment."  Id. ¶ 26.  At

approximately 5:00 p.m., Stockwell was approached by two unidentified police officers with

the Syracuse Police Department, who "stated that he could not use the device without a permit

1

from the City, and ordered [Stockwell] to shut it off."  Id. ¶¶ 27-28.  Stockwell complied with

the officers' order and left shortly thereafter.  Id. ¶¶ 31-32.

        Before making another attempt at amplified religious speech, Plaintiffs Stockwell and

Michael Marcavage ("Marcavage") contacted multiple officials from the City of Syracuse and

the City of Syracuse Police Department seeking clarification of the ordinances governing

sound amplification.  Id. ¶¶ 34- 57, 59-64, 67, 72-85.  Some officials with whom Plaintiffs

spoke stated that Plaintiffs would need a permit before engaging in amplified speech; others

stated that, in practice, no such permits are ever issued.  Id. ¶¶ 36, 49, 51, 61-62.  Eventually,

Plaintiff Marcavage was directed to Sergeant Michael Long ("Defendant Long") in the City's

Licensing Department.  Id. ¶¶ 57, 59, 72.

        Defendant Long identified himself as "the end all" and "an army of one," and stated

that he had checked with "the Chief's Office []" and with the City Hall" to confirm his

understanding of the noise ordinances.  Id. ¶¶ 73, 79.  Referencing the language in the city

ordinances, Defendant Long went on to explain to Plaintiff Marcavage that, in effect, the

ordinances completely prohibit the use of loudspeakers or bullhorns.  Id. ¶¶ 75-78.  Defendant

Long told Plaintiff Marcavage that "If you use one, you're probably either going to be arrested

or told to turn it off . . . ."  Id. ¶ 78.

        Plaintiffs also asked about city policies regarding religious leafleting.  Id. ¶¶ 65-67, 86-

88.  Plaintiff Marcavage was told by a Licensing Department employee that a permit is

required before distributing printed materials – including religious materials – in the city.  Id.

¶¶ 66-67.  The same employee stated that permits take a minimum of a week to be issued.  Id.

¶ 67.  Defendant Long later confirmed that a permit was required to distribute religious

2

material and that if the Syracuse Police Department witnessed Plaintiff Marcavage distributing

literature without a permit, Plaintiff would be asked to leave and – if he continued to distribute

literature – arrested.  Id. ¶ 86-88.  Plaintiffs have stated that they would like to return to the

City of Syracuse to engage in these activities, "but cannot do so without the constant looming

threat of citation and/or arrest."  Id. ¶ 92.

     For a more complete statement of facts, reference is made to the Complaint.

## III.   STANDARD OF REVIEW

     The standards for granting a temporary restraining order are the same as those

governing preliminary injunctions.  AFA Dispensing Group B.V. v. Anheuser-Busch, Inc., 740

F. Supp. 2d 465, 471 (S.D.N.Y. 2010) (citation omitted).  In this Circuit, a court will grant a

motion for a preliminary injunction only where the party seeking the injunction can show "(1)

irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on

the merits or (b) sufficiently serious questions going to the merits to make them a fair ground

for litigation and a balance of hardships tipping decidedly in the movant's favor."  Faiveley

Transp. Malmo AB v. Wabtec Corp, 559 F.3d 110, 116 (2d Cir. 2009).  However, if the

preliminary injunction "'will affect government action taken in the public interest pursuant to a

statutory or regulatory scheme,' it 'should be granted only if the moving party meets the more

rigorous likelihood-of-success standard.'"  Red Earth LLC v. U.S., 657 F.3d 138, 143 (2d Cir.

2011) (quoting Metro. Taxicab Bd. of Trade v.City of New York, 615 F.3d 152, 156 (2d Cir.

2010)).  Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should

not be granted unless the movant, by a clear showing, carries the burden of persuasion."

Moore v. Consol. Edison Co. of New York, Inc., 409 F.3d 506, 510-511 (2d Cir. 2005)

(quotations and citations omitted).

**IV.    DISCUSSION**

    **A.  Irreparable Harm**

      In asserting that they will suffer irreparable harm absent injunctive relief, Plaintiffs

need not claim much beyond a violation of their First Amendment rights.  See, e.g., Elrod v.

Burns, 427 U.S. 347, 373 (1976); Vincenty v. Bloomberg, 476 F.3d 74, 89 (2d Cir. 2007).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury."  Elrod, 427 U.S. at 373.  Irreparable harm can be presumed

"[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech."  Bronx

Household of Faith v. Bd. of Educ. of City of N.Y., 331 F.3d 342, 349 (2d Cir. 2003); Mitchell

v. City of New Haven, No. 3:12cv370, 2012 WL 1188247, at *4 n.3 (D. Conn. Apr. 9, 2012).

Therefore, "the presence of irreparable injury turns on whether the plaintiff has shown a clear

likelihood of success on the merits."  Beal v. Stern, 184 F.3d 117, 123-24 (2d Cir. 1999); see

also Hsu v. Roslyn Union Free Sch. Dist. No. 3, 85 F.3d 839, 853 (2d Cir. 1996) ("[T]he

irreparable harm inquiry depends on the merits of the claims."); Metro. Council, Inc. v. Safir,

99 F. Supp. 2d 438, 443 (S.D.N.Y. 2000) ("In a First Amendment case such as this one, the

issue of irreparable harm merges with the question of success on the merits.").  In this case,

given that Plaintiffs have claimed that their First Amendment rights are being violated, the

Court's determination of irreparable harm is dependent upon an assessment of the merits of

Plaintiffs' claims.

    **B.  Likely Success on the Merits**

Based on the facts alleged in the Complaint and Plaintiffs' emergency Motion for injunctive relief, Plaintiffs' success on the merits of their First Amendment claims appears likely.[1]  In their pleadings, Plaintiffs challenge the relevant ordinances as comprising unconstitutional burdens on Plaintiffs' speech rights both facially and as applied.  See Compl. ¶¶ 95-118.  While the Court finds Plaintiffs' facial challenge to be largely unavailing, after a thorough review of the facts alleged and the applicable case law, the Court concludes that Plaintiffs stand a strong chance of success on the merits of their "as applied" challenge.

As a preliminary matter, the sidewalk near the bus station where Plaintiffs sought to engage in amplified speech and potentially pamphlet clearly appears to be a "traditional" public forum.  See, e.g., Schenck v. Pro-Choice Network of W. N .Y., 519 U.S. 357, 377 (1997) (stating that public sidewalks are the "prototypical example of a traditional public forum"); Hotel Employees & Rest. Employees Union v. City of New York Dep't. of Parks and Recreation, 311 F.3d 534, 544-45 (2d Cir. 2002) (describing as public fora "streets, sidewalks, and parks, which are properties that have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions") (internal citations and quotation

---

[1]  The Court does not purport to undertake an exhaustive analysis of Plaintiffs' claims or any counter arguments that Defendants might raise.  Rather, in determining the necessity of a temporary restraining order, the Court must make a preliminary assessment of the merits of Plaintiffs' claims.  See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979); Jackson v. Johnson, 962 F. Supp. 391, 392 (S.D.N.Y. 1997) ("In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction.") (citations omitted).  The Court has not been fully briefed on each issue by the parties; indeed, the Court has yet to receive any submissions from Defendants (who have only recently been served) and therefore must base its analysis on Plaintiffs' allegations.  As a result, the Court reiterates that its treatment of the merits at this stage of the litigation is not conclusive and is conducted only for the sake of determining the appropriateness and necessity of immediate, temporary injunctive relief.

marks omitted).  In a public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech."  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

In assessing the constitutionality of such restrictions on speech activity in a public forum, courts apply a three part test.  Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011) (citing Ward, 491 U.S. at 791).  "To withstand constitutional scrutiny, government restrictions must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression."  Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006) (citing Ward, 491 U.S. at 791).  In this case, it appears that the regulations on amplified speech and leafleting (both as written and as applied to Plaintiffs) are content neutral.  Without reaching the issue of alternate channels, the Court concludes that Plaintiffs appear to possess a strong case that the city ordinances – as applied – are not narrowly tailored to serve a significant governmental interest.

The ordinances themselves appear carefully crafted to withstand constitutional scrutiny and to regulate only a limited universe of speech.  See § 7-2 (requiring leafleting permits only for business leaflets and identifying a specific carve out for religious leafleting); § 40-3(u) (providing a detailed set of factors to be used in determining if a noise is "unnecessary"); § 40-13 (banning the use of loudspeakers between 9:00 P.M. and 9:00 A.M.); see also Kovacs v. Cooper, 336 U.S. 77, 86-87 (1949) (identifying the governmental interest in protecting citizens from unwanted noise); Costello, 632 F.3d at 45-46; Carew-Reid v. Metro. Transp. Auth., 903

F.2d 914, 917 (2d Cir. 1990).[2]  Plaintiffs make much of the use of the word "unnecessary" in

the ordinances as being undefined and as proof of a vague and overly discretionary standard.

See Mot. at 8-9.  But § 40-3, the "Definitions" section of the Noise Control Ordinance, *does*

provide a definition.  The Ordinance states that "[u]nnecessary noise means any excessive or

unusually loud sound or any sound which either annoys, disturbs, injures or endangers the

comfort, repose, health, peace or safety of a reasonable person of normal sensibilities, or which

causes injury to animal life or damage to property or business." (italics omitted).  This section,

which is never cited in Plaintiffs' briefs, also provides a non-exhaustive list of eleven time-

place-and-manner factors that may be used in determining if sound is "unnecessary."  Id.

       However, Defendant City's official policies – as described by Defendant Long –

contain none of the nuances of the ordinances and appear to exceed the sort of "time, place,

and manner" restrictions that may appropriately be placed on speech in public fora.[3]  Cf. Ward,

---

[2]  The Court notes that facial challenges – particularly at such an early stage in litigation
and without an extensive record – should be handled with kid gloves.  See, e.g.,
Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 (2008);
Hedges v. Obama, No. 12 Civ. 331, 2012 WL 1721124, at *20 (S.D.N.Y. May 16, 2012)
("Facial challenges run the risk of declaring the constitutionality of statutes on an
inadequate record; they run the risk of addressing more than the bare minimum that must be
addressed in order to resolve the problem before a court; and they most importantly
threaten to short circuit the democratic process by preventing laws embodying the will of
the people from being implemented in a manner consistent with the Constitution.") (citing
Washington State Grange, 552 U.S. at 451).  The Court "must keep in mind that 'a ruling of
unconstitutionality frustrates the intent of the elected representatives of the people.'"
Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 320, 329 (2006)
(quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984)).

[3]  Plaintiffs allege that they were told that Defendant Long was the individual in charge of
licensing public amplifier usage and leafleting. Compl. ¶¶ 33-35.  Further, Plaintiffs allege
that Defendant Long represented to them that "he was an army of one" and "the end all"
when it came to obtaining authorization.  Id. at ¶ 34.  Additionally, Plaintiffs allege that
Defendant Long assured them that his interpretation of the city ordinances concerning

491 U.S. at 791.  Indeed, Defendant Long's descriptions of the ordinances and how they would
be applied to Plaintiffs (and have been applied to others seeking to exercise speech rights in the
city of Syracuse) appear to flout both the careful wording of the ordinance drafters and
established First Amendment precedent.

### 1.  Sound Ordinances

As written, the city ordinances regulating amplified sound do not appear to fall afoul of
current First Amendment precedent and instead appear to be specifically targeted and tailored.
"By targeting noise that is 'unreasonable,' [an ordinance] evince[s] an intent to reach noise that
exceeds what is usual and customary in a particular setting."  Costello, 632 F.3d at 46 (quoting
Deegan, 444 F.3d at 143).  As allegedly described by Defendant Long, however, Defendant
Department's method of enforcing these statutes removes all vestiges of restraint and legal
craftsmanship.  See, e.g., Compl. ¶¶ 35-38.  Plaintiffs allege – and the recording submitted
appears to corroborate – that Defendant Long asserted that he and subordinate officers treated
these ordinances as establishing a blanket prohibition on amplified speech, treating the use of
an amplification device as de facto "unnecessary."[4]  See id.

_____

amplified speech were correct, were the interpretations that officers enforced, and were the
interpretations shared and endorsed by Defendant Department.  Id. ¶ 40.  It is also worth
noting that Defendant Long represented to them that he or officers under his command
would fine or arrest Plaintiffs if they sought to preach with the aid of an amplifier or leaflet
without a permit.  Id. at ¶¶ 38-40.  Therefore, for the purposes of this Motion, the Court
believes that Plaintiffs are justified in treating Defendant Long's statements as
representative of Departmental policy for the purposes of an "as applied" First Amendment
claim.

[4]  Upon its review of the Tape submitted in support of Plaintiffs' filings, the Court
concludes that Plaintiffs appear to characterize Defendant Long's statements accurately.  In
the interests of clarity, however, the Court refers to the sections of the Complaint that
describe Defendant Long's statements as opposed to the recorded statements themselves.

While there might certainly be important governmental interests in preventing "unnecessarily" loud noise at certain times and in certain places, see, e.g., Ward, 491 U.S. at 796; Costello, 632 F.3d at 45, a blanket ban on any form of amplified sound appears as though it would encompass a substantial quantity of speech that would not harm these interests. That is, by ignoring the statutory definitions of "unnecessary" laid out in § 40-3, the policy that Defendant Long allegedly outlined to Plaintiff Marcavage rejects any attempt at narrow tailoring and amounts to an unbounded prohibition that appears to exceed the interests in safety and quiet enjoyment laid out elsewhere in the Sound Ordinance. While the ordinances as written provide notice to would-be users of amplified speech devices, including a list of factors to be weighed in determining if speech is unnecessary and therefore allow speakers the opportunity to conform their behavior to the law, the policy as allegedly described by Defendant Long provides no such guidance and forces Plaintiffs and other would-be speakers to choose between no amplified speech on the one hand and fines or imprisonment on the other. Cf. Saia v. People of State of New York, 334 U.S. 558, 559-61 (1948).

"As a blanket ban on the use of sound amplification equipment, the [policy] burdens more speech than necessary to achieve its goals." New York ex rel. Spitzer v. Operation Rescue Nat'l, 273 F.3d 184 (2d Cir. 2001).[5] In an attempt to prevent against a certain form of offensive, intrusive, or dangerous speech, Defendants are not entitled to construct an inescapable legal dragnet that encompasses a broad universe of other speech. See Vincenty v. Bloomberg, 476 F.3d 74, 84-84 (2d Cir. 2007) (quoting Ward, 491 U.S. at 799 n. 7) ("The

---

[5] Although Operation Rescue Nat'l addresses an injunction restricting amplified speech as opposed to an ordinance doing the same, the Second Circuit's reasoning should similarly apply here.

9

'essence of narrow tailoring' is having the regulation 'focus[ ] on the source of the evils the city seeks to eliminate ... and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils.'") (alterations in original).  That amplified sound may certainly cause problems in some situations and therefore may be regulated (as it appears to have been appropriately by the language of the Syracuse Sound Ordinances) does not mean that a police officer may be given free reign to incarcerate individuals engaging in amplified speech if the officer finds the speech – in his own estimation – to be "unnecessary" (as Defendant Long allegedly claims to be able to do).

Compare Kovacs, 336 U.S. at 86-87 (holding that amplified speech can be regulated so as to protect homeowners who are unable to retreat from unwanted sound), with Saia, 334 U.S. at 562 (holding that a broad ban on amplified speech that grants significant official discretion is unconstitutionally broad).  "Any abuses which loud-speakers create can be controlled by narrowly drawn statutes.  When a city allows an official to ban them in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas."  Saia, 334 U.S. at 562.[6]

---

[6]  Although Plaintiffs cite Saia frequently in emphasizing the discretionary and vague nature of the ordinances, the Court only finds such arguments availing in the context of the as applied challenge.  As the Court notes *supra*, the ordinances themselves contain guidelines for enforcing officers and appear to be crafted in such a way as to attempt to strike a balance between vital First Amendment concerns and other community interests, between the rights of the speaker and the listener.  See Kovacs, 336 U.S. at 88; Saia, 334 U.S. at 562 ("Courts must balance the various community interests in passing on the constitutionality of local regulations of the character involved here.  But in that process they should be mindful to keep the freedoms of the First Amendment in a preferred position.") (citing Marsh v. Alabama, 326 U.S. 501, 509 (1946)); Costello, 632 F.3d at 48.  As allegedly applied, however, Defendant City's policies cease to reflect such a balancing and instead provide for the sort of arbitrary enforcement and repression of speech rights against which the Saia Court warns. Saia, 334 U.S. at 562.

Stripped of the carefully-drawn time, place, and manner restrictions laid out in the ordinance, the official policy on amplified speech under which Defendant Long allegedly threatened to fine or incarcerate Plaintiffs appears to be seriously questionable as a matter of constitutional law, if not outright unconstitutional.  Further, Defendant Long's alleged threats of arrest or citation appear to operate as unconstitutional "prior restraints" on Plaintiffs' First Amendment rights, and, as such, cannot be countenanced.  See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976) ("prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights").

### 2.  Bill and Sampling Ordinances

Plaintiffs also claim that the Syracuse Bill and Sampling Ordinances violate their First Amendment Rights.  As with the with the Noise Control Ordinance, the Court finds the arguments advanced in Plaintiffs' facial challenge to be largely unpersuasive, but concludes that Plaintiffs appear to have a strong claim based on the Ordinances' application as allegedly described by Defendant Long.

Much like the Noise Control Ordinance, the Bill and Sampling Ordinances appear to have been crafted with specificity and, actually, appear as though they might not even be applicable to Plaintiffs' behavior.  Plaintiffs identify §§ 7-3 to 7-12 as the applicable regulations governing their proposed distribution of leaflets and assert that they have been denied their First Amendment rights under Defendants' enforcement of these ordinances. Compl. ¶¶ 22, 100.  These Sections as written, however, do not appear to apply to a religious group seeking to disseminate information.  Rather, a reading of the plain text of the chapter on "Bill Postings, Signs and Advertisements" leads the Court to conclude that the statute

11

addresses the *business* of leafleting as opposed to the distribution of informational material.

Section 7-2 clearly states that a license is required for the "*business* of bill poster, bill

distributing, sample distribution *for advertising purposes*, or *sign advertising* without first

obtaining a license therefor as hereinafter provided in this article" (emphasis added).  Further,

§ 7-12 provides an explicit exception from the licensing requirements for religious

organizations.  The Ordinance clearly states that "Nothing in this article shall be construed to

prevent any religious, benevolent, labor or social organization of the city from distributing bills

for advertising its meetings, entertainments, excursions or assemblies." § 7-12.  Read as a

whole, then, the Ordinance appears to impose licensing requirements and fees on commercial

leafleting as opposed to political or religious speech.

As applied to Plaintiffs in the form of Defendant Long's alleged descriptions of and

threats to enforce the Ordinances, however, Defendant City's policy on leafleting in public

places appears incompatible with longstanding First Amendment precedent.  "For over 50

years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering."

Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, 536 U.S. 150, 160

(2002).[7]

> The hand distribution of religious tracts is an age-old form of missionary evangelism –
> as old as the history of printing presses.  It has been a potent force in various religious
> movements down through the years.  This form of evangelism is utilized today on a
> large scale by various religious sects . . . [to] carry the Gospel to thousands upon

---

[7] See also Hynes v. Mayor and Council of Oradell, 425 U.S. 610 (1976); Martin v. City of
Struthers, 319 U.S. 141 (1943); Murdock v. Pennsylvania, 319 U.S. 105 (1943); Jamison v.
Texas, 318 U.S. 413 (1943); Cantwell v. Connecticut, 310 U.S. 296 (1940); Schneider v.
State (Town of Irvington), 308 U.S. 147 (1939); Lovell v. City of Griffin, 303 U.S. 444
(1938).

> thousands of homes and seek through personal visitations to win adherents to their
> faith. It is more than preaching; it is more than distribution of religious literature. It is a
> combination of both. Its purpose is as evangelical as the revival meeting. This form of
> religious activity occupies the same high estate under the First Amendment as do
> worship in the churches and preaching from the pulpits. It has the same claim to
> protection as the more orthodox and conventional exercises of religion. It also has the
> same claim as the others to the guarantees of freedom of speech and freedom of the
> press.

Murdock v. Pennsylvania, 319 U.S. 105, 108-09 (1943). Further, the Supreme Court has held

that statutes requiring individuals to obtain permits prior to leafleting operate as

unconstitutional prior restraints on the exercise of First Amendment rights. See Watchtower

Bible, 536 U.S. at 168.

In this case, Plaintiffs allege that Defendant Long – the individual apparently

responsible for the Syracuse Police Department's licensing decisions – informed them that they

must seek permission and pay a fee in accordance with Chapter 7 of the Bill and Sampling

Ordinance before being allowed to distribute pamphlets. As with his description of the Sound

Ordinances, Defendant Long's alleged assertions about licensing requirements appear to turn

narrowly-crafted statutes into sweeping restrictions and to impose unconstitutional prior

restraints on Plaintiffs' protected speech. By allegedly including statements that it would be

Defendant Department's policy to arrest or fine Plaintiffs if they were to pamphlet without first

obtaining police permission, Defendant Long's declarations of official policy suggest that

Plaintiffs have a strong case that the Bill and Sampling Ordinances as applied were

unconstitutional.

## V.      CONCLUSION

The Court stresses that the relief granted herein is temporary, and is intended to be

narrowly drawn to prevent only the blanket prohibitions – on amplified speech and on religious leafleting without a permit – purported to be the official policy of the City of Syracuse and the City of Syracuse Police Department.  To the extent that Defendants wish to advance a different interpretation of these ordinances (and of Plaintiffs' expressive rights within the City of Syracuse), they may do so in their response.

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' Motion for a temporary restraining order (Dkt. No. 4) is **GRANTED** consistent with this Decision and Order; and it is further

**ORDERED**, that Defendants show cause before the Court at the James T. Foley U.S. Courthouse, 445 Broadway, Albany, NY 12207-2924 on **Tuesday, May 29, 2012 at 2:30 p.m.**, or as soon thereafter as counsel may be heard, as to why the Court should not grant a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure barring Defendants from enforcing the challenged ordinances as to Plaintiffs, and it is further

**ORDERED**, that sufficient reason having been shown therefore, pending the hearing and determination of this application Defendants are hereby temporarily enjoined and restrained, until further order of the Court, from enforcing – as to Plaintiffs – the challenged ordinances to the extent they amount to a blanket prohibition on amplified speech and non-permit-based religious leafleting; and it is further

**ORDERED**, that Plaintiffs serve a copy of this Order to Show Cause on Defendants, by personal delivery (or, if receipt is confirmed by telephone, by facsimile or electronic mail), on or before May 23, 2012; and it is further

**ORDERED**, that Defendants' opposition papers, if any, shall be filed with the Clerk of

the Court and served upon Plaintiffs on or before May 28, 2012.

      **IT IS SO ORDERED.**

DATED:      May 22, 2012
               Albany, New York

                        Lawrence E. Kahn
                        U.S. District Judge

15